# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

STARR L. BAUMGARTNER,

               Plaintiff,

      v.                                   WDWI Case No. 12-C-251

CAROLYN COLVIN,
Commissioner of Social Security,

               Defendant.

---

## DECISION AND ORDER

---

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Starr L. Baumgartner's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. 42 U.S.C. § 401 et seq. (Tr. 126-27.) For the reasons given below, the decision of the Commissioner will be affirmed.

## I. Background

Starr Baumgartner completed three years of college (Tr. 142) and reported earned income every year from 1978 to 2006. (Tr. 129.) Past employment included work as an administrative assistant in a school and as a general office clerk in the manufacturing industry. (Tr. 70-71.) Plaintiff filed an application in November 2008, alleging disability beginning January 2007 due to fibromyalgia, renal disease, pulmonary disorders, depression, diabetes, hypothyroidism, skin disorders, gastroesophageal reflux disease (GERD), sleep apnea, panhypopituitarism (a growth hormone deficiency), and high cholesterol. (Tr. 137-38.) At the time of her alleged onset date,

Plaintiff was 45 years old.  Her application was denied initially and on reconsideration, and she requested a hearing.  (Tr. 87-96.)  On September 14, 2010, a hearing was held before Administrative Law Judge (ALJ) John H. Pleuss at which Plaintiff, represented by counsel, and a vocational expert testified.  (Tr. 35-82.)

At the time of the hearing, Plaintiff was 5'5" tall and weighed 264 pounds (Tr. 60), and she lived with her husband and 21-year old son (Tr. 56).  Plaintiff testified that the deaths of her mother, aunt, grandmother, and stepfather during the period from 2004 to 2006 exacerbated her depression, memory problems, and fibromyalgia.  (Tr. 40-41, 44.)  She stated that she worried excessively, made poor choices at work, had difficulty interacting with coworkers, and had difficulties with concentration.  (Tr. 42-43.)  She claimed she could sit for ten to fifteen minutes, stand for four to four and a half minutes, walk for ten minutes, lift ten pounds, and sit for about a half hour at a time while doing needlework, drawing, or painting.  (Tr. 48-51, 54-55.)  With regard to her daily activities, Plaintiff testified that she did computer puzzles for about two hours a day and needlework for 3-4 hours a day.  (Tr. 68.)  She laid on the couch for twenty minutes a day, took a two-hour nap twice a week, and about twice a month could not do anything because of fibromyalgia pain.  (Tr. 53-54.)  Plaintiff reported that she did very little cooking because she was unable to read the recipes and often confused or omitted ingredients, but she was able to do the dishes, sweep the floor, and sort the laundry.  (Tr. 55.)  She also stated that she became anxious when out in public with a lot of people, and as a result, she stopped doing things with her family.  (Tr. 57, 59.)

Near the end of the hearing a vocational expert (VE) was called to testify.  The ALJ offered five hypotheticals to the VE.  First, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work history who would be limited to light work, precluded from

standing more than thirty minutes at a time or sitting more than thirty minutes at a time without a brief break, with a limited but satisfactory ability to do the following: relate to coworkers; deal with the public; deal with work stresses; maintain attention and concentration; understand, remember, and carry out detailed or complex job instructions; relate appropriately in social situations; and respond appropriately to changes in the work setting. (Tr. 71-72.) The VE opined that an individual with these limitations could perform Plaintiff's past relevant work as a general office clerk or educational administrative assistant. (Tr. 72-73.) The ALJ then asked the VE if the hypothetical individual could perform other jobs in the economy, and the VE stated that the individual could work as mail clerk, electric sealing machine operator, office helper, product assembler, or parking lot attendant, surveillance systems monitor, or lampshade assembler. (Tr. 73-74.)

The ALJ posed four additional hypotheticals to the VE, including one based on a Multiple Impairment Questionnaire completed by psychiatrist Evan Weiden. (Tr. 80; *see* Tr. 937-44.) Dr. Weiden found that Plaintiff suffered from a number of marked limitations in mental functioning, including limitations in her ability to sustain an ordinary routine and respond to changes in the work setting. (Tr. 940-42.) The VE opined that based on the limitations described by Dr. Weiden, the hypothetical individual would not be able to perform Plaintiff's past relevant work. (Tr. 80-81.)

In a decision dated October 27, 2010, the ALJ found Plaintiff not disabled. (Tr. 11-28.) The ALJ found that Plaintiff suffered from the following severe impairments: fibromyalgia, depression with associated cognitive complaints, and obesity. (Tr. 17.) At step four of the sequential process, the ALJ must determine the individual's residual functional capacity (RFC), or "what an individual can still do despite his or her limitations." S.S.R. 96–8p. The RFC represents the maximum a person can do, despite his limitations, on a "regular and continuing basis," which means roughly

3

eight hours a day for five days a week. *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013). In formulating his RFC, the ALJ found that the medical evidence in the record did not fully support the statements of Plaintiff's treating physicians, Drs. Laurel Rabson and Evan Weiden. (Tr. 19.) The ALJ discounted their opinions and instead relied on the conclusions of state agency physicians and psychologists. (Tr. 23.) The ALJ found that Plaintiff had the RFC to perform the kinds of work described in his first hypothetical: a range of light work with limited but satisfactory mental functioning. (Tr. 21.) Based on this RFC, the ALJ concluded that Plaintiff was able to perform her past relevant work as a general office clerk or educational administrative assistant. (Tr. 23.) Alternatively, the ALJ found that Plaintiff could perform a significant number of jobs in the national economy. (Tr. 24.) The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5.)

## II. Analysis

An ALJ's conclusion of no disability is reviewed with deference and will be upheld if it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and her conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d

4

473, 480 (7th Cir. 2008)).   An ALJ must also "confront evidence that does not support his

conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir.

2003). An ALJ's credibility determination is entitled to special deference because the ALJ has the

opportunity to observe the claimant testifying. *Castile v. Astrue*, 617 F.3d 923, 928-29 (7th Cir.

2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.*

The ALJ is also expected to follow the Agency's own rulings and regulations in making his

determination. Failure to do so, unless the error is harmless, also requires reversal. *Prochaska v.*

*Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

Plaintiff contends that the ALJ erred in three respects. She contends that (1) the ALJ failed

to follow the treating physician rule when he discounted the opinions of internist Laurel Rabson and

psychiatrist Evan Weiden; (2) the ALJ's credibility determination is not supported by substantial

evidence; and (3) the ALJ relied upon flawed VE testimony. (Pl.'s Br. at 14-26, ECF No. 8.)

**A. Treating Physician Rule**

Plaintiff's primary argument is predicated on the "treating physician rule," which requires

the Agency to give controlling weight to the opinion of a claimant's treating physician if it is "well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2);

*see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The reason for giving greater weight

to the opinions of treating physicians is that they "are likely to be the medical professionals most

able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may

bring a unique perspective to the medical evidence that cannot be obtained from the objective

medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

At the same time, "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). As the Seventh Circuit has cautioned, treating physicians may bring their own biases to the evaluation:

> The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise.

*Id.* Thus, the ALJ need not blindly accept a treating physician's opinion—he may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). If the ALJ discounts a treating physician's opinion, he must then determine what weight to give the opinion using the factors listed in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including the length of treatment, the physician's specialty, and the consistency and supportability of the opinion. *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009); *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008). While the ALJ must use these factors to provide some explanation for his decision to discount a treating physician's opinion, federal court review is deferential: the ALJ's decision must stand as long as he has "minimally articulated" his reasons for rejecting the treating physician's opinion. *Elder*, 529 F.3d at 415.

Plaintiff argues that the ALJ erred in his assessment of the opinions of treating physicians Dr. Rabson and Dr. Weiden. Both completed questionnaires provided by Plaintiff's attorneys in which they filled in blanks and checked a series of boxes indicating that Plaintiff had severe physical and mental limitations to her functional capacity. (Tr. 928-35, 937-44.) If the limitations set forth in the two questionnaires are true, Plaintiff is clearly disabled. Plaintiff contends that

6

because the reports of both Dr. Rabson and Dr. Weiden are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case, the ALJ was required to give them controlling weight.  His failure to do so, she contends, constitutes error.  Alternatively, even if the opinions of her treating physicians are not entitled to controlling weight, Plaintiff contends the ALJ erred in failing to use the checklist provided by 20 C.F.R. § 404.1527(c)(2) to properly assess the weight their opinions should have received.

The ALJ did not err in failing to accord controlling weight to the opinions of Drs. Rabson and Weiden.  As noted above, the rule requires a treating source opinion to be given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques *and* is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2) (italics added).  Here, the opinions of Drs. Rabson and Weiden were inconsistent with the opinions of the state agency consultants who reviewed the file.

In a Physical Residual Functional Capacity Assessment completed on June 2, 2009, Dr. Mina Khorshidi, M.D., concluded that Plaintiff could perform the full range of light work.  (Tr.644-50.)  Dr. Pat Chan, M.D., reviewed he updated record on September 22, 2009, and affirmed Dr. Khorshidi's opinion, stating "the light exertional level assessed on 06/09 remains an accurate and reasonable evaluation of her function and MDIs [medically determinable impairments]."  (Tr. 916.)  These opinions are in conflict with the Multiple Impairment Questionnaire completed by Dr. Rabson on January 22, 2010.  (Tr. 928-35.)

The record also contains opinions of state agency consultants that conflict with the opinions listed in the Psychiatric/Psychological Impairment Questionnaire that Dr. Weiden completed on

7

March 28, 2010. (Tr. 937-44.)  Psychologist Roger Rattan reviewed the record and completed a Mental Residual Functional Capacity Assessment on June 5, 2009, in which he concluded that Plaintiff was "fully capable of routine unskilled work." (Tr. 667.)  On September 24, 2009, Eric Edelman, state agency psychologist, reviewed the updated record and affirmed Dr. Rattan's opinion, concluding that "claimant retains the capacity to withstand the demands of unskilled work." (Tr. 917.)  Based on this conflicting evidence alone, the ALJ was not required to treat the opinions of Drs. Rabson and Weiden as conclusive.

Plaintiff asserts that under the law of this circuit the opinion of a non-examining state agency physician cannot be used to deny a treating source opinion controlling weight.  In support of her assertion, she relies on *Gudgel v. Barnhart*, 345 F.3d 467 (7th Cir. 2003).  But *Gudgel* only said that a contradictory opinion of a non-examining physician is not enough by itself to justify *rejecting* a treating source opinion; it did not say that such an opinion was not a sufficient basis for denying a treating source opinion conclusive weight.  In other words, when a treating source opinion is contradicted by an opinion of a non-examining physician, the ALJ cannot reject the treating source opinion on that basis alone, but instead should use the checklist of factors in 20 C.F.R. § 404.1527(c)(2) to determine the weight it should be given.  *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) ("There was evidence—the report of the nonexamining consultant—that contradicted the reports of the treating physicians. ....So the presumption falls out and the checklist comes into play.").  Thus, while it is true that a contradictory opinion by a non-examining physician is not, by itself, a sufficient basis for completely rejecting a treating source opinion, it is a sufficient basis to denying the treating source opinion conclusive weight.

It was not only with the findings of the state consultative physicians that the ALJ found the reports of Drs. Rabson and Weiden inconsistent.  The ALJ also found that the reports from Drs. Rabson and Weiden were "entirely inconsistent with the clinical evidence of record and rather profoundly inconsistent with the extent of the claimant's activities." (Tr. 19.)  The questionnaire filled out by Dr. Rabson, for example, stated that Plaintiff could only sit for at most less than an hour in an eight-hour day.  Likewise, Dr. Rabson indicated in the form that the most Plaintiff could stand or walk in an eight-hour day was also less than an hour.  (Tr. 930.)  Dr. Rabson also opined that Plaintiff should never lift more than ten pounds and she had significant limitations in grasping, turning and twisting objects; using fingers/hand for fine manipulations; and using her arms for reaching.  According to Dr. Rapson, her pain, fatigue and other symptoms would constantly interfere with attention and concentration, and she would need an unscheduled break every hour lasting 20 to 30 minutes.  Plaintiff, according to Dr. Rabson, had nothing but bad days, could not handle even low stress, and would miss work more than three days a month because of symptoms related to her impairments or treatment thereof.  (Tr. 933-34.)  According to Dr. Rabson's best medical opinion, 1990 was the earliest date the symptoms and limitations she described in her report applied.  (Tr. 935.)

The questionnaire completed by Dr. Weiden was similar.  In February 2007, Dr. Weiden wrote a letter stating that Plaintiff had difficulties with memory, concentration, mood, energy, and sleep, and that "even when functioning at her best, [she] has had difficulty continuing with work." (Tr. 838.)  And in a March 2010 questionnaire presented by her attorney,  Dr. Weiden checked boxes to indicate Plaintiff had marked limitations in all but four of the twenty functional capacities listed.  On the four for which Dr. Weiden did not check the box for marked limitations, he checked

9

the box for moderate limitations. He also opined she was incapable of tolerating even "low stress" work. (Tr. 940-43.)

None of the clinical evidence in the entire record supports such a dramatic set of limitations. Dr. Rabson, for example, listed three separate diagnoses of her patient's condition in the questionnaire she completed: panhypopituitarism, depression, and cognitive impairment. (Tr. 928.) Fibromyalgia is not even listed, though there is reference to myalgias in the section for "your patient's primary symptoms." (Tr. 929.) The only positive clinical findings Dr. Rabson noted to demonstrate and/or support her diagnoses were lichen sclerosis changes on chest, obesity and right heal ulcer. (Tr. 928.) In the blank for "laboratory and diagnostic test results which demonstrate and/or support your diagnosis," appear the notation "see enclosed – see Dr. Reber's notes also for MRI." (Tr. 929.) Neither the clinical findings nor the laboratory and diagnostic test results support the degree of impairment indicated by Dr. Rabson in the questionnaire.

Plaintiff's attorney appears to have provided the completed questionnaire to the ALJ with no enclosure. (Tr. 927.) Thus, the notation "see enclosed" in response to the request for "laboratory and diagnostic test results which demonstrate and/or support your diagnosis" is of no help. The record does contain, however, notes by Dr. Paul Reber, a osteopathic physician. Dr. Reber's notes for an MRI revealed that Plaintiff's hypopituitarism was stable. (Tr. 436-37.) The ALJ noted that Dr. Reber also completed the familiar Multiple Impairment Questionnaire provided by Plaintiff's attorney on September 30, 2008, and noted that her disability claim was based on "prior memory/cognition impairment," and listed no physical limitations. (Tr. 18, 209-16.) His notes therefore also fail to provide the needed support.

The ALJ noted that while Dr. Rabson diagnosed Plaintiff with gastroparesis and chronic headaches related to brain swelling, there were few references to headaches in the records and endoscopies and other testing on Plaintiff's stomach had been mostly benign. (Tr. 18.)  There was also relatively little in the medical record regarding specific treatment for fibromyalgia or documentation of any tender points to support the diagnosis. (Tr. 17.)  Although Dr. Rabson's note of July 1, 2008, indicates "18/18 tender fibromyalgia points" on exam, there is no indication where the points were located or whether the test was ever repeated.  (Tr. 17, 880.)  There are repeated references to "psychological factors associated with fibromyalgia" in her psychiatrist's reports  (Tr. 691, 699, 740), and even an assessment of fibromyalgia by her podiatrist.  (Tr. 424.)  Little more appears in her Dr. Rabson's records, however, concerning either her diagnosis or treatment of the condition.

The ALJ described in detail Plaintiff's other medical problems reflected in her voluminous medical records, many of which are duplicates or computer print-offs of the same information.  The ALJ also observed that with regard to Plaintiff's chest pain, no cardiac or pulmonary cause was found (Tr. 17), and although Plaintiff alleged breathing difficulties, St. Mary's Hospital found no abnormalities.  (Tr. 17.)  In addition, x-rays on a sprained foot were negative for fracture (Tr. 17), and Plaintiff's diabetes and sleep apnea appeared to be well-controlled.  (Tr. 18.)  Endoscopies had been overall benign except for a small hiatial hernia, and Plaintiff's kidney stone was not expected to cause long-term limitations.  (Tr. 20.)  Plaintiff does not take issue with any of these findings.  Instead, she argues that the ALJ failed to consider additional medical evidence that supports Dr. Rabson's opinions.  In particular, Plaintiff notes that an MRI of the pituitary gland in 2007 revealed

11

"postoperative changes" from her 1991 pituitary gland surgery, and she also presented symptoms of chronic cough, pleuritic back pain, right foot pain, and jaw discomfort.  (Tr. 430, 438 & 541.)

The ALJ sufficiently addressed the 2007 MRI by noting that Radiologist Ronald Dolin, along with Dr. Reber, described the postoperative changes as "stable" and that subsequent neurological and neuropsychological evaluations by Drs. Yucus and Halsten did not reveal any significant problems.  (Tr. 19, 248, 615.)  Thus, it was reasonable for the ALJ to conclude that Dr. Rabson's diagnosis of headaches due to "brain swelling" was not well-supported by evidence in the record.

The more obvious problem with Dr. Rabson's opinions was that they were in conflict with Plaintiff's own activities.  The ALJ noted that Dr. Rabson had indicated Plaintiff had been essentially incapable of performing even sedentary activities since 1990, stating she was incapable of sitting and standing even as much as an hour, could only occasionally lift weights up to ten pounds, was incapable of even low stress work, and subject to extreme environmental limitations including visual limitations.  (Tr. 18, 928-35.)  The ALJ found this portrait of Plaintiff "rather profoundly inconsistent" with Plaintiff's own claim that in 2009 she maintained eight hours a day of professional craft work.  (Tr. 16, 611.)  He also noted that medical records from 2008 which indicated that Plaintiff did professional stitching and was talking about starting a new project involving creating decorative ceramic tiles.  (Tr. 16, 746.)  Given the stark contrast between these accounts of Plaintiff's limitations, the ALJ had a strong basis for according Dr. Rabson's opinion little weight.

As for Plaintiff's mental limitations, the ALJ noted that the clinical basis for Plaintiff's alleged cognitive impairment is somewhat unclear.  (Tr. 19.)  He cited reports of neurologist Chad

Yucus and psychologist Jerry Halsten, who performed neuropsychological testing on Plaintiff. (*Id.*) Dr. Yucus performed a neurological assessment and conducted brief cognitive testing on January 13, 2009. (Tr. 248.) He also reviewed Plaintiff's medical history, including a brain MRI performed within the last four months that according to Dr. Yucus, "had not revealed any structural changes." (*Id.*) Dr. Yucus found that Plaintiff's neurological assessment was "overall unremarkable" and he found "no global deterioration in cognitive performance." (*Id.*) He specifically noted that Plaintiff did not have executive dysfunction, visual spatial/constructional impairments, or language dysfunction, and he found that her visual memory was adequate and that her verbal memory was normal. (*Id.*) Dr. Yucus concluded that he did not find a primary dementia to explain Plaintiff's alleged cognitive impairments or decreased visual acuity and recommended that she discontinue her memory medications. (*Id.*) Dr. Halsten performed additional testing in April 2009 and he noted that Plaintiff "seemed to put forth variable effort" and "did not seem to be attempting to complete tasks as quickly as she could." (Tr. 614.) He opined that some of Plaintiff's cognitive impairments could have been attributable to her mood disorder and chronic pain but concluded that his evaluation "did not provide clear evidence of a neurodegenerative disease" and that in part because of Plaintiff's variable effort, his findings "likely provide an underestimate of her true neurocognitive functioning." (Tr. 615.)

Similarly, the ALJ sufficiently articulated his reasons for not giving Dr. Weiden's opinions controlling weight. As to whether Dr. Weiden's opinions were inconsistent with other medical evidence in the record, the ALJ noted that limitations identified in Dr. Weiden's Questionnaire were inconsistent with the opinions of Drs. Yucus and Halsten. (Tr. 19.) Dr. Weiden found that Plaintiff was markedly limited in sixteen out of twenty categories of mental functioning, including all three

categories involving memory. (Tr. 940.) This is certainly inconsistent with Dr. Yucus's statement that Plaintiff's neurological assessment was "overall unremarkable" and his findings that Plaintiff's visual memory was adequate and that her verbal memory was normal. (Tr. 248.) In addition, Dr. Weiden cited Dr. Halsten's neuropsychological testing in support of his findings, even though Dr. Halsten acknowledged that his findings underestimated Plaintiff's cognitive functioning. (Tr. 615.) Given these differing accounts of Plaintiff's cognitive functioning, the ALJ did not err when he discounted Dr. Weiden's 2010 Questionnaire. In addition, the ALJ's contention that Dr. Weiden's Questionnaire was inconsistent with Plaintiff's daily activities was supported by substantial evidence. In addition to Plaintiff's report of doing eight hours a day of professional craft work, the ALJ also noted that Plaintiff's family felt she was playing an "awful lot" of computer games. (Tr. 19.) Thus, the ALJ sufficiently supported his decision to discount Dr. Weiden's 2010 Questionnaire and subsequent letter dated June 15, 2010.

Plaintiff next argues that even if the ALJ was not required to give controlling weight to Dr. Rabson and Dr. Weiden's opinions, he still failed to weigh the treating physicians' opinions as required by 20 C.F.R. § 404.1527(c)(2)-(c)(6). Plaintiff contends the ALJ should have considered that Dr. Rabson and Dr. Weiden treated Plaintiff for many years and were most familiar with her medical history, treatment, and testing. This argument fails because the ALJ was not required to address every factor, and it is evident that the ALJ focused his inquiry on the consistency and supportabilility factors. *Id.* § 404.1527(c)(3)-(c)(4). The ALJ did not hide his opinion of the Questionnaires completed by Drs. Rabson and Weiden. He found them "entirely inconsistent with the clinical evidence of record and rather profoundly inconsistent with the extent of the claimant's activities." (Tr. 19.) As explained above, the ALJ identified significant inconsistencies between

14

the 2010 Questionnaires and the rest of the evidence in the record.  The ALJ was not required to accept Dr. Rabson and Dr. Weiden's opinions simply because they had treated Plaintiff for a long period of time, and he sufficiently articulated his reasons for discounting their opinions.

Finally, Plaintiff argues that the ALJ erred in adopting the opinions of the state agency physicians and psychologists.  But the agency's own regulations provide that "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(e)(2)(i); see also SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996).  Each of the state agency medical consultants who reviewed the file provided well-reasoned and well-supported opinions regarding Plaintiff's functional limitations that were far more consistent with the record than those provided by Dr. Rabson and Dr. Weiden.  Their ultimate conclusions were provided in narrative form and consisted of more than checking the boxes or circling the numbers that the forms offered by Plaintiff's attorneys.  On June 6, 2009, State Agency Physician Mina Khorshidi completed a Physical Residual Functional Capacity Assessment (PRFCA) form.  (Tr. 643-50.)  In the section reserved for additional comments, Dr. Khorshidi discussed Plaintiff's medical history, including  reports from 2008 and 2009 describing her fibromyalgia pain, sleep apnea, GERD, obesity, and panyhpopituitarism.  (Tr. 650.) Dr. Khorshidi noted that Plaintiff reported no problems with personal care, and she concluded that despite Plaintiff's physical limitations, she could still perform light work.  (*Id.*)  On September 29, 2009, Dr. Pat Chan affirmed Dr. Khorshidi's opinion.  (Tr. 916.) On June 5, 2009, State Agency Psychologist Roger Rattan completed a Psychiatric Review Technique (PRT) form and a Mental Residual Functional Capacity Assessment (MRFCA) form.  (Tr. 651-67.)  In Section III of the

MRFCA, Dr. Rattan gave an RFC assessment.  (Tr. 667.)  He summarized Dr. Weiden's observations of Plaintiff from 2007 to 2009, and he described the neuropsychological testing performed by Dr. Halsten in April 2009. (*Id.*)  Dr. Rattan concluded that despite Plaintiff's mental limitations, she remained "fully capable of unskilled routine work."  (*Id.*)  On September 24, 2009, Dr. Eric Edelman added reports from July and August of 2009 and affirmed Dr. Rattan's findings. (Tr. 917.)

Plaintiff argues that the ALJ erred in adopting the state agency opinions because the state agency experts reviewed a limited portion of the record and their findings were stale at the time of the ALJ's decision.  *See Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010) (finding that an ALJ improperly relied on opinions by state agency psychiatrists and psychologists that were completed prior to the existence of relevant treatment records).  Here, in contrast to *Campbell*, the state agency opinions did not omit any significant medical findings.  The reviewing physicians and psychologists summarized Plaintiff's medical history and reviewed numerous medical records from 2008 and 2009.  The only medical records that came into existence after September 2009 were the Questionnaires completed by Drs. Rabson and Weiden and Dr. Weiden's letter dated June 15, 2010, and the ALJ adequately explained his reasons for discounting those opinions.  Moreover, whether by design or accident, Plaintiff's attorneys didn't submit the completed questionnaires they had Drs. Rabson and Weiden fill out until after the state agency consultants had already completed their reports.  Under all of the circumstances, the ALJ did not err in rejecting the severe limitations that Drs. Rabson and Weiden set forth in the questionnaires from Plaintiff's attorneys..

### B. Credibility Determination

Plaintiff contends that the ALJ's credibility determination was flawed because the ALJ did not properly follow the two-step process for evaluating a claimant's subjective complaints.  First,

the ALJ must determine whether the claimant has established a medially determinable impairment

which could reasonably be expected to produce the pain or other symptoms alleged. *See* 20 C.F.R.

§ 404.1529(b).  If step one is satisfied, the ALJ must then evaluate the credibility of the claimant's

statements describing the intensity, persistence, and functionally limiting effects of her subjective

symptoms. *See id.* § 404.1529(c)(1).  In doing so, the ALJ considers all the available evidence,

including the following factors: (1) daily activities; (2) the location, duration, frequency, and

intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the

type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other

symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6)

any measures other than treatment used to relieve pain or other symptoms; and (7) any other factors

concerning functional limitations and restrictions due to pain or other symptoms.  *See id.*

§ 404.1529(c)(3); S.S.R. 96-7p.  A court's review of a credibility determination is highly deferential,

and a court will reverse the ALJ's determination only if it is "so lacking in explanation or support

that it is patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *see also Skarbek v.*

*Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004) (stating that a credibility determination will be

affirmed "as long as the ALJ gives specific reasons that are supported by the record for his

finding").

Plaintiff contends that the ALJ erred at step one because he did not cite any medical

evidence to support his assertion that "[a]lthough [Baumgartner] has predicated her application for

disability mainly upon cognitive impairment, repeated neurological and neuropsychological testing

has failed to demonstrate any underlying medically determinable physical or mental

impairment(s) . . . that could reasonably be expected to produce such symptoms. (Tr. 22.)  Plaintiff

17

contends that the ALJ impermissibly "played doctor" because none of the medical experts cited by the ALJ ever said that Plaintiff's underlying cognitive impairments could not reasonably be expected to produce her symptoms.  In fact, the evidence cited by the ALJ supports his assertions.  Dr. Yucus concluded that he was "not able to identify a primary neurodegenerative process causing [Baumgartner's] subjective complaints." (Tr. 248.)  Dr. Halsten also declined to diagnose a dementia and suggested that Plaintiff was exaggerating her symptoms by putting forth variable effort during testing. (Tr. 614-15.) These opinions support the ALJ's conclusions, but in any event, the ALJ did not "play doctor" with Dr. Yucus and Dr. Halsten's opinions.  Despite finding a lack of evidence for an underlying physical cause of cognitive impairment in the record, the ALJ still gave Plaintiff the benefit of the doubt and found that Plaintiff's medically determinable impairments "could reasonably be expected to produce some of the alleged symptoms." (Tr. 23.)  He then proceeded to step two and evaluated Plaintiff's credibility based on the factors articulated in SSR 96-7p.  Since the ALJ gave specific reasons that supported his findings and did not draw impermissible inferences with the evidence, he did not err at step one.

Plaintiff also contends that the ALJ's analysis at step two was flawed because he failed to properly assess her daily activities.  The ALJ found that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms was "not entirely credible" because her testimony conflicted with her own accounts of her daily activities.  (Tr. 22-23.)  Plaintiff had testified that she could only lift ten pounds, walk for ten minutes, stand for four to five minutes, and sit for ten to fifteen minutes. (Tr. 17.)  She also testified that at least twice a month she could not do anything due to her fibromyalgia pain. (*Id.*)  The ALJ found this testimony inconsistent with her testimony that she does a lot of computer puzzles and three to four hours of needlework a day, her

18

reports of walking up and down bleachers during football season, and her reports of doing eight hours of work a day for her needlework business, as she described in April 2009. (Tr. 22.) Plaintiff claims the ALJ improperly inferred from these daily activities that Plaintiff is capable of working outside the home. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (finding the ALJ's credibility assessment unsupported by substantial evidence in part because the ALJ placed undue weight on the claimant's ability to perform household activities when the claimant had qualified her ability to perform many of the activities).

It is true that the fact that Plaintiff reported working "approximately 8 hours per day" at her needlework business" in April 2009 (Tr. 611) does not conclusively rule out the possibility that she was only able to sit for a period of ten to fifteen minutes when she testified before the ALJ a year-and-a-half later. (Tr. 48.) But it is not very likely. Nothing in her medical records suggests such a drastic change in her functional capacity over that period of time. On the day Plaintiff reported working eight hours a day, Dr. Halsten noted that Plaintiff "was not described as having demonstrated any loss of functional independence due to cognitive impairment." (Tr. 613.) Dr. Halsten found that Plaintiff was independent in preparing meals, managing her medications, driving during daytime hours, completing shopping errands, doing housekeeping tasks, and scheduling her own appointments. (*Id.*) In addition, the ALJ had previously cited medical records from 2008 indicating that Plaintiff did professional stitching and was talking about starting a new project involving creating decorative ceramic tiles. (Tr. 16, 746.) Thus, it was reasonable for the ALJ to conclude that Plaintiff's testimony was inconsistent with her reports of engaging in significant craft work at home.

Plaintiff also complained that she had trouble concentrating. In fact, however, it appears she had little difficulty concentrating on those things she enjoyed. In February 2007, for example, she

told her therapist that she had difficulty focusing on anything for more than an hour, and thus it was hard for her to do her needlework. (Tr. 711.) At the same time, however, she reported that she was playing a lot of video games to improve her hand/eye coordination, and she would get "off task" and continue playing the video games for an extended period and then have difficulty "getting back on task of employment." (*Id.*)

Given the stark contrast between her testimony and Dr. Halsten's account of her daily activities and other reports in the medical record, the other inconsistencies noted by the ALJ, along with the dearth of medical signs and laboratory findings, the ALJ's conclusion that Plaintiff's testimony as to the severity and limiting effect of her symptoms was not credible was reasonable. Plaintiff's final argument that Baumgartner's extensive work history entitles her to substantial credibility does not change this conclusion. A claimant's work history is not one of the factors articulated in S.S.R. 96-7p, and the ALJ was therefore not required to consider it when making his credibility determination. While ALJ's are required to consider all the evidence in the record, they are not required to address every page of the record and every line of testimony in their opinions. ALJ's are only required to give "specific reasons that are supported by the record." *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004). Here, the ALJ satisfied this requirement, and Plaintiff is therefore not entitled to remand on the basis of a flawed credibility determination.

### C. Vocational Expert Testimony

Plaintiff contends that the ALJ relied on flawed VE testimony when he found that she was capable of performing her past relevant work. First, she argues that the testimony was flawed because the ALJ's RFC finding did not include the limitations found by Drs. Rabson and Weiden in the 2010 Questionnaires. As already explained, however, the ALJ's decision to discount these

Questionnaires was supported by substantial evidence. The ALJ did not err, therefore, in failing to incorporate the functional limitations set forth in the questionnaires in the hypothetical question he posed to the VE. Plaintiff's first argument is therefore without merit.

Second, Plaintiff argues that the ALJ failed to account for Plaintiff's limitations in concentration, persistence, or pace. When determining the severity of her impairments at steps two and three of the analysis, the ALJ adopted the finding of State Agency psychologists Edelman and Rattan that Plaintiff had moderate difficulties with concentration, persistence, or pace. (Tr. 20.) The ALJ's first hypothetical provided that Plaintiff had a "limited but satisfactory" ability to deal with work stresses, maintain attention and concentration, and understand, remember, and carry out detailed or complex job instructions. (Tr. 71-72.) The Seventh Circuit has held that an ALJ may not account for moderate limitations in concentration, persistence or pace by restricting the inquiry to "simple, routine tasks" or "unskilled work." *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009). Plaintiff contends that "satisfactory" resembles the terminology found insufficient in *O'Connor-Spinner* and *Stewart* and makes Plaintiff's limitations in concentration, persistence, or pace seem *de minimis*.

Plaintiff's argument rests on confusing the ALJ's determination whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed on 20 C.F.R. Part 404, Subpart P, Appendix I (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526) at step three of the sequential evaluation and his determination of the claimant's RFC. The SSA uses a "special technique" to determine whether a claimant has a mental impairment, whether it is severe, and whether it meets the criteria for one of the Listings for mental impairments in Part A of the Listing of Impairments. 20 C.F.R. § 404.1520a. The special technique used to evaluate mental

impairments requires first an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1).  If a mental impairment is found, SSA then rates the degree of functional limitation resulting from it in four broad functional areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) and (4).  The degree of limitation in the first three areas is rated on a five-point scale: none, mild, moderate, marked and extreme.  The degree of limitation for episodes of decomposition is rated on a four-point numerical scale: none, one or two, three, four or more.  These ratings are then used to determine whether the mental impairment is severe and, if so, whether it meets the criteria of one of the Listings for mental impairments. If a claimant has had no episodes of decomposition and the first three functional areas are rated none or mild, the agency generally concludes that the claimant does not have a severe mental impairment. 20 C.F.R. § 404.1520a(d)(1). If a claimant's impairment meets or medically equals the criteria for one of the listed impairments, the individual is deemed disabled at step three of the SSA's sequential evaluation process. 20 C.F.R. § 404.1520(d)(2).  If, however, a mental impairment is severe, but does not meet or medically equal a listed impairment, then the SSA assesses the claimant's RFC.  20 C.F.R. § 404.1520a(d)(3).

The Psychiatric Review Technique (PRT) form is used to document the various steps required by the special technique to evaluate a mental impairment. A second form, the Mental Residual Functional Capacity Assessment (MRFCA), is used to document the more detailed evaluation that is required when the claimant's impairment, though severe, does not meet or exceed the criteria of a Listing and a mental RFC must be determined.  The use of these forms is explained

in the SSA's Program Operations Manual System (POMS), which is available at https://secure.ssa.gov/apps10/poms.nsf . *See* DI 24505.025 and DI 24510.060.

In this case, Dr. Rattan completed both the PRT and the MRFCA forms based on his review of Plaintiff's file. On the PRT, Dr. Rattan checked the boxes to indicate Plaintiff had moderate limitation in maintaining concentration, persistence or pace (R. 661.), and the ALJ adopted his finding. (Tr. 20.) Plaintiff contends that having adopted Dr. Rattan's finding that she would have moderate difficulties in maintaining concentration, persistence or pace, the ALJ was required to incorporate that limitation into the RFC he formulated and in his hypothetical posed to the VE. Because he did not, Plaintiff contends that a remand is required.

But as explained above, the PRT is used only to document the special technique used by the agency to determine whether the claimant's mental impairment is severe and, if so, whether it meets or medically equals a listing. It is not intended to document the claimant's mental RFC presumably because the findings are so general. For example, the box Dr. Rattan checked on the PRT indicated Plaintiff had moderate difficulties in the single category of "maintaining concentration, persistence, *or* pace." (Tr. 661.) (emphasis added). The MRFCA, by contrast, breaks that single category into eight separate subcategories. (Tr. 665-66.) Thus, if the consultant documents the general findings on the PRT that indicate that the mental impairment is severe but does not meet or medically equal a listing, the MRFCA must be completed to document the more detailed evaluation required to determine the claimant's RFC. As the ALJ explained, "the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not a residual functional capacity assessment but are used to rate the severity of impairments at steps 2 and 3 of the sequential evaluation process." (Tr. 21.) In so stating, he was explicitly following the applicable regulation and ruling. *See* 20 C.F.R.

23

§ 404.1520a(d); *see also* SSR 96-8p, 1996 WL 374184, *4 (1996) ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.").

As the regulation requires, after using the special technique to determine that Plaintiff's mental impairment was severe but did not meet a listing, Dr. Rattan went on to determine her mental RFC using the more detailed MRFCA. It is in the MRFCA that the medical consultant is to record the claimant's mental RFC. The first section of the MRFCA is entitled "Summary Conclusions." There the form lists twenty mental health functions grouped under four main categories: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. To the right of each of the mental health functions is a series of decision checkblocks under the headings: not significantly limited; moderately limited; markedly limited; no evidence of limitation in this category; and not ratable on available evidence. At the end of the form is a space under the heading "Functional Capacity Assessment" where the actual mental RFC is to be recorded in narrative form. (R. 364–68.) *See* POMS, DI 24510.060.

Unlike the PRT, the MRFCA does not have a box for "none" or only "mild" limitations. In completing the worksheet section of the form, the medical consultant is instructed to check box one indicating that the claimant is "'Not Significantly Limited,' when the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity."

24

POMS, DI 24510.063.  Box two, indicating the claimant is "Moderately Limited," is to be checked "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." *Id.*  In other words, a "moderate" limitation on the MRFCA means only that there is some limitation.  The instructions note that "[t]he degree and extent of the capacity or limitation must be described in narrative format in Section III."  POMS, DI 24510.063.  Finally, even with these qualifications, the worksheet itself is not considered part of the RFC.  According to the POMS, "Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS DI 24510.060 (bold original); *see also Smith v. Commissioner of Social Sec.*, 631 F.3d 632, 637 (3d Cir.2010) ("Because Smith cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that the hypothetical question was deficient, his argument is without merit as it pertains to Dr. Tan and Dr. Graff.").

In this case, Dr. Rattan checked boxes in the "Summary Conclusions" section of the MRFCA he completed indicating Plaintiff had moderate limitations in the following activities: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to respond appropriately to changes in the work setting.  (Tr. 666.)  As noted above, however, these checks on the worksheet section of the form meant merely that Plaintiff had some limitation in these areas.  In the narrative section of the report where the consultant is required to elaborate on the claimant's capacities and describe the claimant's mental RFC in narrative form, Dr. Rattan noted that

Plaintiff was "fully capable of routine unskilled work." (Tr. 667.) And Dr. Rattan's findings were later confirmed by Dr. Edelman. (Tr. 917.)

It was this finding that the ALJ could have incorporated into the RFC and used to formulate the hypothetical question he posed to the VE. In this respect, this case much more like *Johansen v. Barnhart* than *Stewart v. Astrue* and the other cases Plaintiff cites. In *Johansen*, a state agency physician concluded that the claimant fell somewhere between "Not Significantly Limited" and "Moderately Limited" in three areas. *Johansen v. Barnhart*, 314 F.3d 283, 285–86 (7th Cir.2002). The doctor then "translated his worksheet observations into an assessment of Johansen's mental residual functional capacity (RFC) and concluded that he could perform repetitive, low-stress work." *Id.* at 286. The ALJ then incorporated this RFC into a hypothetical question to the VE, asking whether there would be available jobs for someone of the claimant's age and experience who could perform low-stress, repetitive, unskilled work. The Seventh Circuit found this perfectly acceptable: "because Dr. Matkom was the only medical expert who made an RFC determination, the ALJ reasonably relied upon his opinion in formulating the hypothetical to present to the [vocational expert]." *Id.* at 289. Thus, the ALJ was not even required to incorporate the limitation of moderate difficulty maintaining concentration, persistence or pace into his hypothetical.

Here, the ALJ did more. He specifically incorporated the limitations noted by Dr. Rattan in the Summary Conclusion section of the MRFCA. This is more than *O'Connor-Spinner* and *Stewart* require. Those cases hold that an ALJ may not translate a claimant's moderate limitations in concentration, persistence, and pace into one or two words that do not fully account for the full extent of the claimant's limitations. Here, as explained above, it was not the ALJ that translated Plaintiff's mental RFC into an ability to perform routine unskilled work; it was the medical

consultant.  The ALJ then included all of the moderate limitations that Dr. Rattan noted on the

worksheet section of the MRFCA into his hypothetical using the phrase "limited but satisfactory."

Though these additional limitations were not required, if they had been, the phrase "limited but

satisfactory" sufficiently accounted for them.  *See Dunn v. Astrue*, 563 F. Supp. 2d 950, 959 (W.D.

Wis. 2008) (finding that "'[l]imited but satisfactory' is a reasonable interpretation of the term

'moderate'").  Moreover, the ALJ explained to the VE that "limited but satisfactory," did not mean

"average or okay." (Tr. 72.)  Rather, the ALJ explained that "limited but satisfactory" represented

the least severe category of mental limitation, in relation to "seriously limited but not precluded"

and "no useful ability."  (*Id.*)  The court is satisfied that the VE understood "limited but satisfactory"

to express moderate rather than *de minimis* limitations.  Thus, even if the limitations noted on the

worksheet should have been incorporated into the hypothetical, the ALJ adequately accounted for

them.  And while he may have omitted the further limitation that the work be unskilled, any error

in doing so was harmless since all of the jobs identified by the VE were in fact unskilled.  *See

Coleman v. Astrue*, 269 Fed.Appx. 596, *3 (7th Cir. March 14, 2008) (holding that incomplete

hypothetical question posed to VE in social security disability benefits case, resulting from ALJ's

alleged failure to incorporate all of claimant's relevant limitations, did not warrant reversal where

knowledge of the omitted limitations could be imputed to the VE).

Finally, Plaintiff argues that the ALJ erred by relying on testimony from the VE that

conflicted with the DICTIONARY OF OCCUPATIONAL TITLES (*DOT*).  The ALJ asked the VE to

assume an individual limited to light work, but also precluded from standing or sitting for more than

thirty minutes at a time without a brief break.  (Tr. 71.)  The VE identified jobs that could be

performed with such a limitation, but the VE did not explain that the *DOT* does not detail whether

27

jobs can be performed with a stand/sit option.  Social Security Ruling 00–4p requires the ALJ to identify and explain any conflict between the *DOT* and VE testimony. *Prochaska v. Barnhart,* 454 F.3d 731, 735 (7th Cir.2006).  However, a conflict between the VE's testimony and the *DOT* does not *per se* invalidate a VE's testimony.  S.S.R. 00-4p.  If the claimant raises the inconsistency at the hearing, the ALJ must elicit a reasonable explanation for the inconsistency. *See Overman v. Astrue,* 546 F.3d 456, 463–64 (7th Cir. 2008).  If the claimant does not raise the inconsistency at the hearing, the duty to inquire arises only if the conflict between the *DOT* and VE testimony is apparent. *Id.*  The Seventh Circuit has found that "because the *DOT* does not address the subject of sit/stand options, it is not apparent that the testimony [concerning stand/sit options] conflicts with the *DOT*." *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008).  Here, the apparent inconsistency between the testimony regarding sit/stand options and the *DOT* was not raised at the hearing.  Since the inconsistency not obvious, the ALJ's failure to address this issue did not invalidate his findings.  Plaintiff is therefore not entitled to remand on the basis of flawed vocational expert testimony.

### III. Conclusion

For the reasons given above, the decision of the Commissioner is affirmed.  The clerk is directed to enter judgment accordingly.

**SO ORDERED** this  _31st_  day of October, 2013.


  s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court